**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**RICHARD G. HARPER et al.**                                          **CIVIL ACTION**

**VERSUS**                                                                     **NO. 22-4347**

**GEICO INDEMNITY COMPANY et al.**                      **SECTION: "G"(1)**

## ORDER AND REASONS

Plaintiffs Richard and Paula Harper ("Plaintiffs") bring this litigation against Defendants Geico Indemnity Company, Zachary L. Kampf, Great Northern Insurance Company, and Vanguard Inspection Services arising out of a motor vehicle collision.[1] Before the Court is Great Northern Insurance Company and Vanguard Inspection Services' (collectively, "Movants") "Motion for Summary Judgment."[2] Plaintiffs oppose the motion.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion.

## I. Background

On January 18, 2022, Plaintiffs filed a Petition in the 32nd Judicial District Court for the Parish of Terrebonne against Geico Indemnity Company ("Geico") and Zachary L. Kampf ("Kampf").[4] Plaintiffs allege that Richard Harper was driving his Ford F-150 south bound on Louisiana Highway 24 in the left lane and approaching the intersection with Waterplant Road

---

[1] Rec. Doc. 1-2.

[2] Rec. Doc. 18.

[3] Rec. Doc. 23.

[4] Rec. Doc. 1-2.

1

Bridge in Houma, Louisiana, when his Ford F-150 collided with Kampf's Toyota Corolla.[5] According to Plaintiffs, Kampf was traveling south bound on Louisiana Highway 24 in the right lane and approaching the intersection with Waterplant Road Bridge when he "suddenly and without warning crossed the lane divider and entered the left southbound lane of Louisiana Highway 24 in an attempt to turn left onto Waterplant Road Bridge, striking the vehicle being driven by [Richard Harper], causing damages and severe injury to [Richard Harper]."[6] Plaintiffs allege that Kampf was cited with "Turning From Wrong Lane."[7] Plaintiffs further assert that Geico was the insurer for both Plaintiffs and Kampf.[8]

Plaintiffs brought a negligence claim against Kampf, asserting that Kampf's negligence was the proximate cause of the collision and the resulting damages they suffered.[9] Plaintiffs also brought a strict liability claim against Kampf.[10] In addition, Plaintiffs brought a breach of contract cause of action against Geico for failure to pay claims Plaintiffs filed under their policy and a cause of action under the Louisiana Direct Action Statute, Louisiana Revised Statute Section 22:1269, as Geico is also Kampf's insurer.[11] Plaintiffs seek damages for injuries Richard Harper suffered

---

[5] *Id.* at 1–2.

[6] *Id.* at 2.

[7] *Id.*

[8] *Id.* at 2–3.

[9] *Id.*

[10] *Id.* at 2.

[11] *Id.* at 2–3.

from the motor vehicle incident, including damages for the loss of consortium Paula Harper suffered as a result of her husband, Richard Harper's injuries.[12]

On May 10, 2022, Plaintiffs filed a First Amended Petition, adding Vanguard Inspection Services ("Vanguard") as a Defendant, alleging that Vanguard was Kampf's employer and that Kampf was acting within the scope of his employment when the accident occurred and seeking vicarious liability from Vanguard.[13] On September 1, 2022, Plaintiffs filed a Second Amended Petition, adding Great Northern Insurance Company ("Great Northern") as a Defendant since Great Northern is Vanguard's insurer.[14] On November 1, 2022, Great Northern removed the case to this Court based on diversity jurisdiction under 28 U.S.C. Section 1332(a).[15] On November 27, 2023, Movants filed the instant "Motion for Summary Judgment."[16] On December 14, 2023, Plaintiffs filed an opposition.[17] On December 15, 2023, Movants filed a reply.[18]

## II. Parties' Arguments

### A.    *Movants' Arguments in Support of the Motion*

In the motion, Movants contend that Plaintiffs' claims against them must be dismissed because Kampf was not an employee of Vanguard for vicarious liability to apply.[19] In support of

---

[12] *Id.* at 4.

[13] *Id.* at 10–12.

[14] *Id.* at 18–19.

[15] Rec. Doc. 1.

[16] Rec. Doc. 18.

[17] Rec. Doc. 23.

[18] Rec. Doc. 27.

[19] Rec. Docs. 18, 18-1.

the motion, Movants offer as summary judgment evidence the deposition of Richard Harper, the deposition of Zachary Kampf, the affidavit of Vanguard Inspection Services, the Independent Contractor Agreement ("ICA") between Kampf and Vanguard, Kampf's timesheets, and Kampf's W-9.[20] Movants explain that Vanguard is a joint venture formed for the purpose of pursuing and executing a Housing Inspection Services ("HIS") contract with the Federal Emergency Management Agency ("FEMA").[21] Movants further explain that Vanguard maintains a roster of independent housing inspectors like Kampf who can be deployed to disaster zones to conduct inspections to assess the level of damage to affected properties.[22]

Movants note that the test for determining whether a worker is an employee is laid out by the Louisiana Supreme Court in *Hickman v. Southern Pacific Transportation Company*.[23] Movants argue that these factors weigh in favor of finding that Kampf and Vanguard do not have an employee/employer relationship.[24]

Movants next note that "Louisiana recognizes some situations in which a principal may be liable for the tortious conduct of its independent contractor."[25] These two situations are where the

---

[20] Rec. Docs. 18, 18-4, 18-5, 18-6.

[21] Rec. Doc. 18-1 at 3.

[22] *Id.*

[23] *Id.* at 6 (citing *Hickman v. S. Pac. Transp. Co.*, 262 So. 2d 385, 390–91 (La. 1972)). Vanguard and Great Northern note that these factors include "whether (1) there is a valid contract between the parties; (2) the work being done should be of an independent nature such that the contractor may employ nonexclusive means in accomplishing it; (3) the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) a specific price is set for the overall undertaking; and (5) a specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach."

[24] *Id.* at 5–10.

[25] *Id.* at 10.

4

principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions.[26] Movants note that the Fifth Circuit has held that "[o]perational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is  not entirely free to do the work in his own way." [27] The Fifth Circuit has defined "step by step process" as being where a principal substitutes the independent contractor's entire method and manner of operation for one of its own.[28] Movants point to Kampf's testimony in which he testified that Vanguard does not require inspectors to work a certain amount of hours a day, he is free to determine the number of inspections he conducts each day, Vanguard does not have its own inspection guidelines, Vanguard does not provide Kampf with a main point of contact, Kampf uses his own phone, personal email address, and tools to conduct inspections, and Vangurd does not provide him tools needed to conduct the inspections.[29] Movants conclude that "Vanguard did not exercise operational control over Kampf as it relates to his inspection activities such that Vanguard can be liable to plaintiff for the car accident at issue."[30] Movants cite several cases from other sections of this Court and Louisiana intermediate appellate courts in support of this argument.[31]

---

[26] *Id.* (citing *Goodie v. Exxonmobile Oil Corp.*, No. 13-5228, 2014 WL 1764777, at *3 (E.D. La. May 2, 2014) (Africk, J.) (quoting *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992).

[27] *Id.* (citing *Goodie*, 2014 WL 1764777, at *9–11 (quoting *Fruge*, 337 F.3d at 564).

[28] *Id.* at 16–17 (citing *McDaniel v. R.J's Transp., L.L.C,* p. 11–12 (La. App. 2 Cir. 1/13/21); 310 So. 3d 760, 766 (citing *Romero v. Mobil Expl.*, 727 F.Supp.293 (W.D. La. 1989), aff'd 939 F.2d 307 (5th Cir. 1991)).

[29] *Id.* at 18 (citing Rec. Doc. 18-5).

[30] *Id.* at 11.

[31] *Id.* at 11–17 (citing *Henderson v. Atmos Energy*, 509 F.Supp.3d 625, 630 (E.D. La. Dec. 28, 2020) (Africk, J.); *Cole v. Seal Enterprises, Inc.*, No 20-2248, 2021 WL 2351125 (E.D. La. June 9, 2021) (Feldman, J.); *McDaniel,* 210 So. 3d 760).

**B.      Plaintiffs' Arguments in Opposition to the Motion**

In their opposition to the motion, Plaintiffs contend that there are material facts in dispute regarding the control that Vanguard had over Kampf and thus, over whether Kampf is an employee or an independent contractor.[32] Plaintiffs aver that "the largest disputed fact is whether or not [Kampf] was on the phone being directed to the location at the time of the accident."[33] Plaintiffs contend that most of the *Hickman* factors favor finding that Kampf is an employee rather than an independent contractor.[34] Plaintiffs argues in the alternative that the motion should be denied because Kampf is an employee.[35]

Plaintiffs also argue that Kampf's testimony that he is an independent contractor is motivated by his desire to avoid the termination of the ICA, as the ICA stipulates that Vanguard will terminate Kampf if he states he is an employee.[36] Finally, Plaintiffs contend that because Kampf did not have any bargaining power as to his compensation and received the standard pay that other inspectors received, Kampf is an employee rather than an independent contractor.[37]

**C.      Movants' Arguments in Further Support of the Motion**

In their reply, Movants reiterate that "Kampf is an independent contractor deployed under a specific set of circumstances to perform specific work for a specific purpose …"[38] Similarly,

---

[32] Rec. Doc. 23 at 1–2.

[33] *Id.* at 7.

[34] *Id.* at 4–7.

[35] *Id.* at 7.

[36] *Id.* at 6.

[37] *Id.* at 6–7 (citing *Reed v. Ross*, 2019-616, p. 7 (La. App. 3 Cir. 2/27/20); 297 So. 3d 29, 35).

[38] Rec. Doc. 27 at 3.

Movants also reiterate that Vanguard "does not give inspectors a certain amount of hours they need to work and inspectors are free to conduct the number of inspections they perform each day or week."[39]

Movants argue that Plaintiffs fail to analyze how their interpretation of the provisions mentioned in their opposition demonstrate Vanguard's "step-by-step operational control" of Kampf.[40] Movants also note that Plaintiffs have not cited any jurisprudence that supports their position and that Plaintiffs' arguments regarding the ICA is confusing or conclusory.[41]

In reply to Plaintiffs' argument that Vanguard trains Kampf, "Vanguard attests to the fact that it does not have its own inspection guidelines or criteria; rather, everything is through FEMA."[42] As to Plaintiffs' argument that the tablets in Kampf's possession are provided to him by Vanguard, Movants counter that these are tablets "authorized by FEMA …"[43] In reply to Plaintiffs' argument that Kampf was purportedly on the phone with his boss at Vanguard, Movants counter that this "is unfounded and contradicts Kampf's own testimony" and that "[P]laintiffs fail to cite any actual legal support for the proposition that being on the phone is the kind of step-by-step operational control that is used by courts in evaluating contractor status …"[44]

---

[39] *Id.* at 4.

[40] *Id.* at 3

[41] *Id.*

[42] *Id.*

[43] *Id.* at 4.

[44] *Id.*

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[45] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[46] All reasonable inferences are drawn in favor of the nonmoving party.[47] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[48] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[49] The nonmoving party may not rest upon the pleadings.[50] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[51]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine

---

[45] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[46] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[47] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

[48] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[49] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[50] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[51] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

issue of material fact.[52] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[53] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[54] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[55]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[56] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[57]

## IV. Analysis

### A.      *Whether Kampf is an employee or an independent contractor*

Under Louisiana Civil Code article 2320, an employer may be held liable for damage

---

[52] *Celotex*, 477 U.S. at 323.

[53] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[54] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[55] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[56] *Little*, 37 F.3d at 1075 (internal citations omitted).

[57] *Morris*, 144 F.3d at 380.

caused by an employee in the employee's exercise of the functions in which he or she is employed.[58] "For an employer to be held liable for the actions of an employee under article 2320, the plaintiff must show that (a) a master-servant relationship existed between the tortfeasor and the employer, and (2) the tortious act of the tortfeasor was committed within the scope and during the course of his employment with the employer."[59] "The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis."[60] Further, "[t]he existence of an independent contractor agreement is not necessarily dispositive of the issue of whether [a worker] is an independent contractor, as opposed to an employee …"[61] Rather, "[t]he courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the [company] over the [worker's] activities."[62]

In *Hickman*, the Louisiana Supreme Court set forth five factors for courts to consider in determining whether an employee/employer relationship exists.[63] These five factors are:

> (1) whether there is a valid contract between the parties;
> (2) whether the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;
> (3) whether the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered;
> (4) whether there is a specific price for the overall undertaking agreed upon; and
> (5) whether the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding

---

[58] La. Civ. Code art. 2320.

[59] *See Hughes v. Goodreau*, 2001-2107, p. 5–6 (La. App. 1. Cir. 12/31/02); 836 So. 2d 649, 656 (citation omitted).

[60] *Tower Credit, Inc. v. Carpenter,* 2001-2875, p. 6 (La. 9/4/02); 825 So. 2d 1125, 1129 (citations omitted).

[61] *Arroyo v. East Jefferson Gen. Hosp.*, 06-799, p. 6 (La. App. 5 Cir. 3/13/07); 956 So. 2d 661, 664.

[62] *Id.*

[63] *Hickman*, 262 So. 2d at 390–91.

liability for its breach.[64]

Although the existence of a contract is considered in the determination of an employee/employer relationship, the court ruled that this relationship is also to be determined "from their intentions in establishing and carrying out that relationship as manifested in its performance and the surrounding circumstances."[65] Further, determining whether an employer/employee relationship exists requires the application of the principal test: the control over the work reserved by the employer.[66] The court remarked that "it is not the supervision and control which is actually exercised which is significant, the important question is whether, from the nature of the relationship, the right to do so exists."[67]

The court applied these five factors in *Hickman*, a case arising from a motor vehicle accident, and concluded that the defendant tortfeasor, Robert Fowler ("Fowler"), was an employee rather than an independent contractor for the defendant's employer, Southern Pacific Transport Company ("Southern Pacific"), to be held vicariously liable.[68] The court reasoned that Fowler's limited freedom in performing his work, such as the time for performance of Fowler's duties and the manner in which he performed them, as well as the fact that Fowler did not work or contract with any other company, made it "readily apparent that Fowler [was] not an independent contractor."[69] In coming to this conclusion, the court considered that Fowler's sole source of work

---

[64] *Id.*

[65] *Id.* at 390.

[66] *Id.* at 391.

[67] *Id.*

[68] *Id.* at 385, 391.

[69] *Id.* at 391.

11

was with Southern Pacific.[70] The court also considered that Fowler was not free to carry out this work by his own methods, reasoning that "[i]t would be specious to believe that he could radically vary his methods or patterns of pickup and delivery without provoking a reprimand or disciplinary action by Southern Pacific …"[71] The court also noted that "the most telling[] fault in the contention that these facts present an independent contractor relationship is the stipulation that the contract between the parties could be terminated by either party upon written notice to the other, without incurring liability for breach …"[72]

Here, Movants contend that these five *Hickman* factors favor finding that Kampf is not an employee.[73] Plaintiffs counter that there is a genuine dispute over the material facts relevant to whether Vanguard exerted control over Kampf such that Kampf could not perform his work independently.[74] Plaintiffs argue in the alternative that the *Hickman* factors favor finding that Kampf is an employee.[75] The Court addresses each *Hickman* factor in turn.

### 1. First factor

First, the Court must determine whether there is a valid contract between Kampf and Vanguard.[76] Movants argue that the ICA is a valid contract between Kampf and Vanguard that

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Rec. Doc. 18-1 at 5–10.

[74] Rec. Doc. 23 at 1.

[75] *Id.* at 7.

[76] *Hickman*, 262 So. 2d at 391.

defines Kampf as an independent contractor.[77] Plaintiff does not contest that the ICA is an existing contract between Kampf and Vanguard but contends that the ICA is not solely determinative of whether Kampf is an employee or an independent contractor.[78] The ICA is a valid contract between Kampf and Vanguard.[79] Thus, this factor favors finding that Kampf is an independent contractor rather than an employee.

### 2. Second and third factors

Second, the Court must determine whether the work Kampf did is of an independent nature such that Kampf may employ non-exclusive means in accomplishing it.[80] And third, the Court must determine whether the ICA calls for specific piecework as a unit to be done in accordance with Kampf's own methods, without being subject to the control and direction of Vanguard, except as to the result of the services to be rendered.[81] Louisiana intermediate appellate courts have noted that "[f]actors two and three are generally discussed together and refer to the methods used to complete the project, the non-exclusiveness of those methods, and the degree of control exercised by the principal."[82] Further, the third factor "specifically focuses on the degree of control exercised by the principal, as well as calling for a specific piecework as a unit."[83]

---

[77] Rec. Doc. 18-1 at 6–8.

[78] Rec. Doc. 23 at 1.

[79] *See* Rec. Doc. 18-6.

[80] *Hickman*, 262 So. 2d at 391.

[81] *Id.*

[82] *Simon v. Farm Bureau Ins. Co.*, 2019-278, p. 6 (La. App. 3 Cir. 2/4/20); 297 So. 3d 147, 151.

[83] *Id.* (citation omitted).

> **i.** **Whether the work Kampf did was of an independent nature and whether Kampf employed non-exclusive means in accomplishing it, without being subject to the control and direction of Vanguard**

Movants contend that factors two and three favor finding that Kampf was not an employee because "Kampf was able to conduct home inspections in the manner he saw fit and on his own time," including setting his own schedule, determining the number and order of inspections he conducts in a given day, and having the ability to turn down inspections.[84] Movants note that Kampf received training for conducting the inspections from FEMA and the criteria for the home inspections was provided by FEMA.[85] Movants reason that conversely, "Vanguard does not have its own inspection guidelines or criteria nor does Vanguard provide the means and methods by which [Kampf] is to use to achieve a FEMA-compliant inspection."[86] Movants also note that Kampf was given no other tools other than a government issued tablet to conduct the inspections.[87]

Plaintiffs counter that the ICA, despite being titled an Independent Contractor Agreement, provides Vanguard control over Kampf to make him an employee.[88] According to Plaintiffs, Clause 10 of the ICA does not authorize the contractor to utilize helpers or assistants without the express permission of Vanguard.[89] Plaintiffs also note that Clause 3 of the ICA states that Vanguard will pay the contractor for mandatory training, and Plaintiffs aver that during these

---

[84] Rec. Doc. 18-1 at 8–9.

[85] *Id.* at 8.

[86] *Id.*

[87] *Id.* at 9.

[88] Rec. Doc. 23 at 4–5.

[89] *Id.* at 5.

trainings, "they are told exactly how to do their job."[90] Plaintiffs note that Kampf "had to go through dozens of hours of training, which even included how to deal with customers."[91] Plaintiffs contend that "[c]ontrolling how a worker simply interacts with a customer is potentially the most control one can demonstrate over an individual."[92] Further, Plaintiffs argue that Vanguard "provides him with a tablet for the assigned tasks and he must complete the tasks in the manner in which Vanguard trained him."[93]

Here, the terms of the ICA, Zachary Kampf's testimony, and Richard Harper's testimony reflect a genuine dispute of material fact as to whether Kampf was able to perform the work independently without the control of Vanguard.

On one hand, Kampf offered testimony indicating that he had a high degree of independence in choosing whether he wanted to be deployed to natural disaster areas and the order of the inspections he was given to conduct.[94] Kampf testified that he was able to accept or decline a deployment when inspections opened up after a disaster, explaining that "it is not committing to a certain amount of days, it is just committing to go out there and then we're free to leave at any point we want."[95] Kampf testified that he used his own tools to perform the property inspections, except for an iPad tablet provided by Vanguard.[96] Kampf provided conflicting testimony as to

---

[90] Id.

[91] Id.

[92] Id.

[93] Id. at 6.

[94] Rec. Doc. 18-5 at 9–11.

[95] Id. at 9, 10, 13, 21.

[96] Id. at 20, 29, 30.

15

whether the government or Vanguard owned the iPad tablet, but testified that he received the tablet from Vanguard as the distributor.[97] The ICA provides that the tablet is owned by the government and its use is mandated by FEMA.[98] Kampf also testified that when a homeowner was not at home for him to perform an inspection, he would leave a flyer with his personal email and phone number for the homeowner to contact.[99] However, the flyer had Vanguard's logo printed on it.[100] Kampf also testified that Vanguard does not have its own inspection criteria and during trainings, Vanguard applied FEMA inspection guidelines.[101] Kampf's testimony on this point is consistent with the ICA, as the ICA states that Kampf "shall perform all services in accordance with FEMA's most recent public guidelines related to the Individuals and Households Program and the Prime Contract."[102]

On the other hand, the terms of the ICA and Kampf's testimony indicate that Vanguard exerts some control over how he performs his work. Although Kampf initially testified that he believed he received training from FEMA when he first began working as a property inspector, Kampf later testified that it was Vanguard personnel who were the trainers.[103] Kampf also testified that he watched many hours of training videos and completed online tests that Vanguard

---

[97] *Id.* at 8, 23, 29.

[98] Rec. Doc. 18-6 at 6.

[99] Rec. Doc. 18-5 at 13–14.

[100] *Id.*

[101] *Id.* at 25.

[102] Rec. Doc. 18-6 at 4.

[103] *Id.* at 5, 25.

required.[104] Kampf testified that the content of these trainings contained "mostly safety in the fields, dealing with customers," including "exactly what each of our encounters with the customer should be like."[105] Kampf further testified that prior to a deployment, Vanguard conducts a one day training "to get updated on whatever's changed in the tablet or with Vanguard ..."[106] The ICA also prohibits Kampf from using any assistants or helpers in performing the property inspections unless he receives written permission from Vanguard.[107]

While Kampf testified that he was able to choose to accept or reject a deployment, once he accepts, Kampf was required to complete an inspection within three to five days of receiving it as "Vanguard is very clear they want us to turn these around as quickly as we can."[108] Similarly, he testified that if he was unable to turn in "a certain amount within a few days, [he will] be dismissed."[109] He also testified that he was expected to work full time once accepting deployment.[110] Kampf also testified that Vanguard told him "not to start before sunlight and not to continue work after sunset" for safety reasons.[111] If Kampf encountered a problem during an inspection, he could call Vanguard to ask for help and someone "working more in a supervisory

---

[104] *Id.* at 5–7.

[105] *Id.* at 7–8.

[106] *Id.* at 11.

[107] Rec. Doc. 18-6 at 4.

[108] Rec. Doc. 18-5 at 12, 19.

[109] *Id.* at 28.

[110] *Id.* at 10.

[111] *Id.* at 22.

position" would be available to help.[112] Kampf also testified that Vanguard conducts quality checks of some of his inspections and Vanguard may inform him of what he did wrong during an inspection.[113] According to Kampf, Vanguard could fire him if he was doing an inadequate job based on the quality reviews of his inspections.[114] Although the ICA provides that Kampf "may perform services for any other clients, persons, or companies as [Kampf] sees fit, so long as in the reasonable opinion of Vanguard such services do not create a conflict of interest,"[115] Kampf testified that Vanguard does not permit him to work for other inspection companies while he works for Vanguard.[116] Kampf testified that he began working for Vanguard in 2017 and Vanguard is the only housing inspections company he has worked for since then.[117]

Kampf and Richard Harper's testimonies also reflect a genuine dispute over whether Kampf was on the phone with Vanguard and received driving directions from Vanguard after the collision. Kampf testified that he did not call or text anyone ten minutes or so before the incident and was "a hundred percent certain [he] was not on the phone at that time."[118] Kampf also testified that "[t]here is not often communication with [Vanguard] during that route."[119] However, Richard Harper testified that after his and Kampf's vehicles collided, "[a]ll [Kampf] remembered was being

---

[112] *Id.* at 17.

[113] *Id.*

[114] *Id.*

[115] Rec. Doc. 18-6 at 8.

[116] Rec. Doc. 18-5 at 13, 31.

[117] *Id.* at 6, 9.

[118] *Id.* at 5, 35.

[119] *Id.* at 4.

18

on the phone with his[] boss," and that Kampf said "I'm sorry, I was on the phone with my boss because the GPS wasn't working … [120] Richard Harper explained that "[Kampf] couldn't get the GPS going, so he got on the phone with his boss and they were directing him to his next client."[121] Kampf testified that in the moments before the vehicles' collision, he was searching for the correct place to meet a client, as that client could not meet at the property location and Kampf's GPS was not working to provide him directions to where the client wanted to meet.[122]

Overall, Kampf's testimony alone reveals that there is a genuine factual dispute as to whether Kampf was able to independently conduct the inspections without the control of Vanguard. Kampf testified that he used his own supplies for conducting the inspections other than the tablet, he was able to choose to work a deployment, and he was able to select the order of the inspections he was given. However, Kampf also testified that he was trained by Vanguard personnel on conducting an inspection, including how to interact with customers, and he could obtain the advice of someone at Vanguard in a "more supervisory role" if he was unsure about an inspection. Moreover, once Kampf chose to work a deployment, he was expected to complete the inspections within three to five days, work full time, and work during sunlight hours. Further, Kampf testified that he was not allowed to work for another contractor, despite the ICA stating that he was allowed to do so unless Vanguard believed it to be a conflict of interest. Kampf's testimony and Richard Harper's testimony are also in conflict as to whether Kampf was on the phone with someone from Vanguard and whether that person provided Kampf with directions to

---

[120] Rec. Doc. 18-4 at 25.

[121] *Id.*

[122] Rec. Doc. 18-5 at 3–4.

his next client, as Kampf's GPS was no longer working.

     ii.    **Whether the contract calls for specific piecework as a unit to be done**

Movants aver that Kampf is paid based on the number of inspections he completes and his level of experience.[123] Movants note that Kampf is paid on a 1099 basis and is responsible for paying his own taxes.[124] Plaintiffs counter that in addition to the fee per inspection Kampf receives, he was also paid per diem for food, travel, hotel, and other accommodations.[125] Plaintiffs reason that "normal contractual relationships do not cover per diem and other travel expenses" but that "this is a type of compensation that is very common among employer-employees."[126]

The ICA provides that Kampf will be paid "based on hours worked at the prevailing wage under the Service Contract Act's applicable wage determination as required by FEMA …" and Kampf will not "be paid below the minimums specified by … the Service Contract Act. …"[127] In addition, the ICA provides that Kampf may earn performance pay based on the number of inspections completed.[128] Kampf testified that he is paid $39 or $40 per inspection completed.[129] Kampf further testified that he turns in timesheets both for the number of inspections performed and the number of hours worked.[130] Although the ICA does not expressly state that Kampf is paid

---

[123] Rec. Doc. 18-1 at 9.

[124] *Id.* at 9–10.

[125] Rec. Doc. 23 at 6.

[126] *Id.*

[127] Rec. Doc. 18-6 at 5.

[128] *Id.*

[129] Rec. Doc. 18-5 at 10, 22, 31.

[130] *Id.* at 22.

per inspection, it appears that Kampf's pay is based on the number of inspections performed but is adjusted as hourly pay to comply with minimum hour wages required by federal law for contractors. Although Kampf appears to be paid per inspection completed, Kampf also testified that he is paid for trainings that Vanguard provides, but this amount he is paid for trainings is unknown.[131] Therefore, this factor is neutral.

### 3. Fourth factor

Next, the Court must determine whether there is a specific price for the overall undertaking agreed upon.[132] As more fully discussed above, Kampf testified that he is paid $39 or $40 per inspection, but his pay is adjusted so that it complies with federal laws governing minimum wage. Kampf also gets paid for trainings provided by Vanguard, but neither the ICA nor Kampf specified the amount Kampf is paid for the trainings. Although there is a set price set for each inspection, the number of inspections are not set, and Kampf is also paid an unspecified amount for trainings. Therefore, this factor is neutral.

### 4. Fifth factor

Finally, the Court must determine whether the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.[133]

---

[131] *Id.* at 7–8.

[132] *Hickman*, 262 So. 2d at 391.

[133] *Id.*

Movants contend that Kampf's deployment ends when there are no longer any FEMA applicants that require their homes to be inspected.[134] Plaintiffs counter that because the ICA allows either party to terminate the agreement by providing seven days' notice and because the ICA states that Vanguard could terminate Kampf for violating their policies and procedures without providing any cause, "this tends to resemble at-will employment and not a contract for services."[135]

Here, the ICA provides that the agreement "will remain effective until the completion of the Prime Contract, or until this Agreement is terminated by [Kampf] or Vanguard …"[136] Kampf initially testified that he only signed one contract with Vanguard when he began working for them in 2017 but later testified that he signed another contract in 2020.[137] The ICA the parties attached is signed and dated in 2020 by Kampf and Vanguard.[138] Although Movants contend that Kampf's work is complete when a disaster ends, Kampf's work has been continuous through several years and Kampf has worked through several disasters. Kampf testified that he has worked for Vanguard since 2017 performing inspections in the aftermath of Hurricanes Ian, Irma, and Ida.[139] The ICA also allows both Kampf and Vanguard to terminate the contract without cause by giving seven

---

[134] Rec. Doc. 18-1 at 10.

[135] Rec. Doc. 23 at 6.

[136] Rec. Doc. 18-6 at 8.

[137] Rec. Doc. 18-5 at 9, 27.

[138] Rec. Doc. 18-6 at 12.

[139] Rec. Doc. 18-5 at 5–6, 9.

days' notice.[140] Vanguard may also terminate the contract for cause at any time.[141] The ICA does not state that Kampf or Vanguard is liable for any breach.[142] In *Hickman*, the Louisiana Supreme Court found that the most significant factor in determining that the defendant tortfeasor was an employee rather than an independent contractor was the clause in the contract that the contract could be terminated by either party without incurring liability for breach.[143] Overall, this factor weighs in favor of finding that Kampf is an employee rather than an independent contractor.

### 5. Conclusion

While the first and third *Hickman* factors partly favor finding that Kampf is an independent contractor, the fifth *Hickman* factor favors finding that Kampf is an employee. Part of the third factor and the fourth factor are neutral. The second and third factors, which focus on whether Kampf was able to do his work independently without the control and direction of Vanguard, is genuinely factually disputed, as there are conflicts in the ICA, Kampf's testimony, and Richard Harper's testimony. In addition, the material facts in dispute require a factfinder to weigh Vanguard's degree of control and Kampf's degree of independence to carry out his work. Louisiana intermediate appellate courts have recognized that "[t]he principal test in determining whether a relationship is an employer-employee relationship or a principal-independent contractor relationship is control over the work."[144] Therefore, the Court is unable to conclude as a matter of

---

[140] Rec. Doc. 18-6 at 12.

[141] *Id.*

[142] *See* Rec. Doc. 18-6.

[143] *Hickman*, 262 So. 2d at 118–19 (citations omitted) (The court concluded that the "right to terminate the relationship without cause, where no term of employment is prescribed, is characteristic of the master and servant or employer-employee relationship" and that conversely, "[t]he right is at the same time antagonistic to the independent contractor relationship.").

[144] *Hulbert v. Democratic State Cent. Comm. of La.*, 2010-1910, p. 5 (La. App. 1 Cir. 6/10/11); 68 So. 3d

23

law that Kampf was an independent contractor or an employee.

Louisiana appellate courts have come to similar conclusions given similar facts. The Louisiana Supreme Court in *Hickman* considered facts such as the employer restricting the worker's time for the performance of the worker's tasks, the employer was the worker's sole source of employment, the worker was threatened with reprimand or disciplinary action by the employer if the worker "radically var[ied] his methods or pattern of [work tasks]," and either party could terminate the contract without liability for breach in concluding that the worker was an employee rather than an independent contractor.[145]

Similarly, in *Simon v. Farm Bureau Insurance Company*, the Louisiana Third Circuit Court of Appeal applied *Hickman* and concluded that the defendant tortfeasor, Doughty, was an employee rather than an independent contractor.[146] The employer, Beta, argued that it "controlled only the services to be rendered by Doughty and the end product, but not Doughty's work as a landman, so as not to affect Doughty's status as an independent contractor."[147] In concluding that Doughty was an employee, the court considered the fact that Doughty was "expected" to be in Beta's office location at a certain time each day.[148] Specifically, Doughty testified that if he deviated from these hours Beta "would not be happy," and he believed it would result in his termination.[149] The court also found significant the fact that "Beta was Doughty's sole source of

---

667, 670 (citation omitted).

[145] *Hickman*, 262 So. 2d at 391.

[146] *Simon.*, 297 So. 3d at 157.

[147] *Id.* at 151.

[148] *Id.* at 152.

[149] *Id.*

employment, and Doughty testified he did not believe he could work for other companies without negative repercussions from Beta."[150] Finally, the court found significant that the contract between the parties did not hold either party liable in the event of a breach.[151] In support of its conclusion that Doughty was an independent contractor, the court cited to *Hughes v. Goodreau*.[152]

In *Hughes*, the Louisiana First Circuit Court of Appeal concluded that real estate agents were employees of a real estate broker firm, rather than independent contractors, despite the existence of a written contract stipulating that the agents were independent contractors.[153] The court noted that the brokers did not dictate the number of hours to be worked, the amount of properties to be overseen, or how agents were to spend their time while working.[154] However, the court noted that the agents worked exclusively for the broker, the contract required them to comply with the Policy and Procedures Manual prepared by the broker, and the associates were required to attend an introductory orientation on the broker's policies.[155] In coming to its conclusion, the court also considered that the contract could be terminated at any time by either party or could be terminated by the broker for breach.[156]

In *Honeycutt v. Deutschmann*, another motor vehicle tort case, the Louisiana Fifth Circuit Court of Appeal concluded that there was a factual dispute as to whether a worker was an employee

---

[150] *Id.* at 153.

[151] *Id.* at 155.

[152] *Id.* at 154 (citing *Hughes,* 836 So. 2d 649).

[153] *Hughes*, 836 So. 2d at 659.

[154] *Id.*

[155] *Id.*

[156] *Id.*

or an independent contractor, despite the express terms of a contract identifying the worker as an independent contractor.[157] The defendant tortfeasor, Alicia Deutschmann ("Deutschmann"), worked for Choice Courier Systems ("Choice") as a driver delivering blood to hospitals.[158] Don Oubre ("Oubre") was a manager at Choice and testified that if a driver such as Deutschmann wanted to hire someone to help with the blood deliveries, the driver had to obtain approval from Choice.[159] The court also noted that there was a dispute of fact between Oubre's testimony that individuals could work for other companies while they were working for Choice and Deutschmann's testimony that she could not work for other delivery services when she was working for Choice.[160] The court also found significant that "the testimonies presented indicate that if Choice was dissatisfied with a driver, the dispatcher would simply stop giving that driver delivery assignments."[161] The court noted that although drivers could refuse delivery assignments, "if a driver did so repeatedly, that driver was viewed as unreliable and was dropped from the roster."[162]

Like the cases discussed above where courts found significant that the worker was expected to complete work tasks in a set amount of time in concluding that the worker was an employee, Vanguard expected Kampf to complete an approximate number of inspections a day and that his

---

[157] *Honeycutt v. Deutschmann*, 07-211, p. 7 (La. App. 5 Cir. 1/22/08); 976 So. 2d 753, 756.

[158] *Id.* at 754.

[159] *Id.* at 756.

[160] *Id.*

[161] *Id.*

[162] *Id.*

assigned inspections are to be completed in three to five days.[163] Further, just as the courts above have found it significant that the worker could be reprimanded or terminated for work that deviated from the employer's expectations, Kampf could be terminated if he did an "inadequate job" on inspections.[164] Just as in *Honeycutt* where the court found it significant that the worker was unable to hire a helper without the approval of the employer, the ICA does not allow Kampf to use a helper without the approval of Vanguard.[165] Like *Hickman*, *Simon*, and *Hughes*, either Kampf or Vanguard can terminate the ICA without liability for breach.[166] Similar to *Hickman*, *Simon*, *Hughes*, and *Honeycutt*, Kampf testified that he could not work for other inspections agencies while working for Vanguard.[167] In the end, a factfinder will need to weigh Kampf's testimony as to Vanguard's control and his own independence in conducting the property inspections. Kampf's testimony will also need to be weighed against the terms of the ICA, Vanguard's affidavit, and Richard Harper's testimony to determine his legal relationship with Vanguard. Therefore, the Court concludes that factual disputes preclude it from resolving this issue on summary judgment.

**B.    *Whether Vanguard Exercised Operational Control over Kampf***

"[A] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent

---

[163] *Hickman*, 262 So. 2d at 391; *Simon*, 297 So. 3d at 152.

[164] *Hickman*, 262 So. 2d at 391; *Simon*, 297 So. 3d at 152; *Honeycutt*, 976 So. 2d at 756.

[165] *Honeycutt*, 976 So. 2d at 756.

[166] *Hickman*, 262 So. 2d at 391; *Simon*, 287 So. 3d at 155; *Hughes*, 836 So. 2d at 155.

[167] *Hickman*, 262 So. 2d at 391; *Simon*, 287 So. 3d at 153; *Hughes*, 836 So. 3d at 659; *Honeycutt*, 836 So. 2d at 756.

contractor's actions."[168] "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."[169] Further, "inspection of the work done by an independent contractor and direction as to the final results of the project is insufficient to support a conclusion that the principal has retained enough control over the project to be liable for the independent contractor's negligence."[170]

Here, Movants point to many of the facts they referenced in support of their argument that Vanguard did not exercise control over Kampf to make him an employee rather than an independent contractor.[171] Specifically, Movants point to Kampf's testimony that Vanguard does not require him to work a certain amount of hours a day, he is free to determine the number of inspections he conducts each day, Vanguard does not have its own inspection guidelines, Vanguard does not provide Kampf with a main point of contact, Kampf uses his own phone, personal email address, and tools to conduct the inspections, and Vanguard does not provide him tools needed to conduct the inspections.[172] Plaintiffs did not provide direct briefing on this issue of whether Vanguard exercised operational control over Kampf.[173]

Because many of the facts relevant to whether Vanguard exercised operational, step-by-

---

[168] *LeJeune*, 950 F.2d at 270.

[169] *Fruge*, 337 F.3d at 564.

[170] *Koerner v. Vigilant Ins. Co.*, No. 16-13319, 2017 WL 4682295, at *12 (E.D. La. Oct. 18, 2017) (Africk, J.) (internal quotations and citation omitted).

[171] Rec. Doc. 18-1 at 18 (citing Rec. Doc. 18-5).

[172] *Id.*

[173] *See* Rec. Doc. 23

step control over Kampf are the same as the disputed facts relevant to whether Vanguard exercised

control over Kampf as an employee, there are genuine issues of material fact in dispute regarding

whether Vanguard exercised operational control over Kampf. Because there is a genuine dispute

over these material facts, the Court is unable to determine that as a matter of law, Vanguard did

not exercise operational control over Kampf.

### V. Conclusion

Based on the foregoing, there are facts in dispute precluding summary judgment on

whether Kampf was an employee or independent contractor of Vanguard. There are also facts in

dispute precluding summary judgment on whether Vanguard exercised operational control over

Kampf. Accordingly,

**IT IS HEREBY ORDERED** that Movants' Motion for Summary Judgment[174] is

**DENIED**.

**NEW ORLEANS, LOUISIANA**, this  17th   day of January, 2024.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[174] Rec. Doc. 18.